illegal in playing charitable bingo under California Penal Code Section 326.5. Unfortunately, the district court's ruling effectively would invalidate the charitable bingo statute and allow for the use of these electronic bingo machines. These slot machine-like devices and the gambling games that are played on them are totally unlike bingo as defined by the charitable bingo statute. In determining that the slot machine-like electronic gambling devices may be used to raise money for charities, the district court has simply substituted its judgment of the appropriate scope of gambling for that of the California state legislature. There are several undisputed facts that bear on this court's determination in this case. Again, as this court stated in its last order in this case, appellees' electronic gambling machines are prohibited by state law. It is also undisputed that the gambling displays that are on these machines as their primary feature are wholly unnecessary to their play of bingo. It is undisputed that these devices are not offered just to disabled persons but are available to any and all comers. It is also undisputed that charitable bingo as an activity in California is provided for only by virtue of the California state constitution, state statute, and local ordinance. Counsel, if the district court's order were enforced, what would the state of California do if its law prohibits the slot machines from being used? Then what happens? Effectively, the provisions of SB 1369 and several of our penal code sections dealing with slot machine-style devices or gambling devices would effectively be invalidated by the court's order and would have to be allowed as a reasonable accommodation to the disabled. The State's position is that it would then allow these slot machine-like devices to be used rather than finding that the district court's order effectively nullified the provisions even authorizing bingo at all in California. Well, that is an issue that I haven't contemplated. As I see it, that position, the court's position, would nullify the illegality of these machines as a means of playing charitable bingo. Right. The question is, maybe I'm misinterpreting it, you're going to shut down bingo, period? If the district court's order is enforced, I mean, if we affirm the district court's preliminary injunction, is the logical conclusion that you're going to shut down all bingo games? I don't believe so in that right now we're under the order and we're having to basically the state is allowing the continued use of these machines pending the resolution of this litigation. So I can't say that bingo would be that all charitable bingo would be effectively eliminated. However, who knows what the state legislature might do in response to this, because the state legislature has already responded with SB 1369, which made clear that these types of devices could not be used for the play of charitable bingo. One of the findings of the district court that seemed to be central was that there really were no alternatives, that the alternatives presented by the state didn't solve the problem in terms of a reasonable accommodation, were not realistic alternatives. What do we have in the record that establishes that one way or the other? First of all, I believe that you have to address the electronic bingo machines independently of the finding as to what else might be available for the disabled. In other words, the electronic bingo machines have to be looked at on their own. Are they a reasonable accommodation or are they a fundamental change to the game of bingo so that they are not a reasonable accommodation? We actually, and I don't want to digress too much, but we actually do not feel that there's any state service involved to where this case has even come. I understand. I'm just interested right now in the factual status of the record as to whether or not accepting the arguments as true and valid, whether or not the record supports the district court's conclusion that there are no reasonable alternatives. No, because we also, before the district court issued its order, first of all, there's SB 1369, which specifically provides for a regulatory mechanism in providing assistance to the disabled. Prior to the hearing, we put before the district court the anticipation that a regulation was going to be issued with some language. Then prior to the court's written order, before it became final, we put before it the agenda of the Gambling Control Commission with the regulation, and we've requested that you take judicial notice of it, that basically set out a scheme of reasonable accommodation that in no way requires these types of devices. To say that these types of devices that are wholly different than bingo are the only reasonable accommodation is it borders on frivolous. I have to say. And the other thing is, is that we have three or four different device makers, all with different devices that do play a bit differently, all saying they're the only reasonable accommodation. I think the argument on its face is just without any kind of merit. Counsel, with respect to the regulations, I want to make sure that I'm reading these regulations correctly. I understand about the accommodations that are made, but it appears to me that the operator of a bingo game doesn't have to offer an accommodation. Is that correct? It doesn't have to allow a cardminder. No, I don't believe that they would have to allow a cardminder, but if they have cardminders in place, they have to reserve those. Have to reserve those and make them available and so on. Yes. So that means then that we could have bingo parlors in which no accommodation would be available at all. Is that correct? No, because the other provisions of the of the regulation allow for devices, different types of devices that are for the for people who cannot call out bingo. They have different types of devices for that. And then the regulation also allows for live assistance and live assistance. In terms of being a viable means of reasonable accommodation is specifically discussed in Tennessee V Lane. And they refer they reference the propriety of live assistance to the disabled and accessing government services. And they cited 28 CFR three five one point five oh B one. Additionally, in American Association of People with Disabilities versus Shelley, live assistance in terms of voting was also seen as a reasonable means of accommodation. So the regulation provides for live assistance. Does it does it allow it or require it? It allows it because our position is that we is that the state regulation actually says shall allow. So what does that mean? And don't don't say me. I want to say the way SB 13 69 is written is that it sets forth regulations that would it sets forth the regulatory authority in the commission to set forth means by which the operators can lawfully. Accommodate people with disabilities. This goes back to this not being a state service. The state doesn't provide bingo. Bingo operators provide bingo. The only parameters the state puts on any sort of reasonable accommodation being offered by them, which is not a title two issue, which is actually I believe would be like a title three issue. It's a title three issue. But the title two issue is enforcement. The title two issue is enforcement. But but if you look at McGarry, first of all, McGarry was direct enforcement on the disabled individual. Secondly, in McGarry, the state or the the city had control of the reasonable accommodation mechanism, which was more time for him to clean up the nuisance here. The state does not have control of the reasonable accommodation mechanism. The reasonable accommodation mechanism is controlled almost wholly by the by the provider. And when I say almost wholly by the provider, I mean the bingo operator. When I say almost wholly, I mean just so long as it's not an unlawful gambling device, the state would allow them to provide anything that they want to provide. Or not allow. Or not allow. Or not. It's voluntary with the bingo provider. Yes. The bingo provider is, yes, the bingo provider is the one who's providing the service, not the state. The state. That would be a title three issue. I assume for sake of argument that the machine, whatever it is, is not allowed, and there's no requirement that the bingo provider give this other assistance. Don't we end up right where we are without any assistance that is required for the disabled to play bingo? No, because the ADA does require the bingo operator to make the game accessible. Right, under title three. And use reasonable accommodations. The argument, I think, is that under title three, there's an obligation on the behalf of the bingo provider to provide access, accessibility, reasonable accommodation. And the state is preventing the bingo operator from complying with the law by shutting down all the ability to accommodate. That's the argument. And the only ability that the state is shutting down are these electronic slot machine-like devices that fundamentally alter bingo. Right. My question to you, though, and I understand your argument that our time is getting down. Yes. My question to you was, the district courts, really there are no practical alternatives. You answered my question by pointing to the regulations. Do you have an example that's in the record of where this kind of accommodation that's been discussed has actually worked? I believe, and I don't have the pages, but I believe we have the declaration of Sandra Johnson, where she's talked about other accommodations that were used in live call bingo for years. And electronic bingo machines have only been around for a couple of years. So live call bingo has been addressing issues of reasonable accommodation for years. But, again, the issue of whether there may be some other means available is not necessarily dispositive of this case. The issue is these devices that the court is endorsing are they have to be looked at in their own right as to are they a reasonable accommodation. They play games that aren't necessary. So they're not necessary to prevent discrimination. They are they fundamentally alter the game of bingo. So they're not required under Tennessee v. Lane. So they have to be looked at in their own right and not necessarily in reference to what else is there that the bingo operator currently has. And the regulation sets forth what we believe are very reasonable parameters that a bingo operator can follow by providing means for reasonable accommodation. At this point, I've gone well over my time, and I will allow the county to finish up. Okay. Good afternoon. My name is John Reed. I'm a deputy county counsel for Sacramento County. I'm here today representing this county's sheriff. And I'm going to skip a preamble and jump right into the point that Mr. Williams left off with, and that is accommodations and points in the record where you can see some of the accommodations that have been used in the past. There is a declaration from Ms. Karen Walsh. She is the bingo compliance manager. She is essentially the regulator for the charities. She describes the use of Braille cards and having observed disabled individuals playing the live call game for several years. I'd also ask you to look at the new ordinance, SEC 1403, which does include essentially carves out an exemption from the prohibition against the volunteers running the charity or running the bingo games from playing. It allows those volunteers to actually assist those with disabilities in the play of live call bingo. In other words, the aid that could be provided by another individual is expressly allowed in the county's code, and it's anticipated that that would be an employed accommodation. The county in bringing this appeal did recognize the likelihood that the attorney general would be bringing certain issues, and in the appeal did address our own local issues quite a bit. That would be the fact that the district court did not address Sacramento County's own ordinance. Also, certain findings that the district court made were attributed to the county, which did not necessarily apply. A very big concern was the scope of the injunction in restricting the county's ability to enforce its own laws. I think those are all well stated in my briefs, and I did want to open myself up for questions that the panel may have, and it sounds like you do have a few. I don't think we have any separate questions right now for the county, but why don't you save the minute for rebuttal and some issues may come up, and we'll try to accommodate the time. Good afternoon, Your Honors. Eric Grant, representing Plaintiff El Camino Athletic Boosters Club. I'm going to share argument today with my colleague, Ms. Froelich, who represents the other plaintiffs. I think the crucial question that was asked earlier is what do we have in the record on the question of reasonable accommodation, and what the district court found in its order at page 39 of Volume 1 of the excerpts of record is that on one side, on the plaintiff's side, we have all the evidence, and on the other side, the defendant's side, we have none. And in particular, what the district court had before it about the reasonableness of accommodation were the declarations of disabled individuals. Those are cited, first of all, at El Camino's brief at page 30, and more extensively in the other brief, the UCP brief at page 37 and 38, and those are the declarations of disabled individuals Noreen Bartel, Terry Rosaro, Mary Brown, and Robert Foss. And so the question is not whether there is a conceivable accommodation by card-minding devices or live assistance. Yes, those are conceivable accommodations. The question, though, and what this court has said is it is an intensively fact-based question, is whether those accommodations actually work in this particular situation. And what the district court found, as a matter of fact, based on these declarations, numerous declarations on one side, and really nothing on the other, is that in this situation, in the context of charitable bingo in Sacramento County, these conceivable accommodations don't actually work. They're not reasonable alternatives. And the one reasonable alternative is electronic gaming devices of the phone. But that's not the bingo that the State has defined. How can it possibly be an accommodation to what the State has defined as live call bingo? How can a slot machine be an alternative to live call bingo? First of all, Your Honor, with respect, these are not slot machines, and that's the — Well, I'm from Las Vegas. I've got a pretty good idea as to what they are. Well, Your Honor, the record evidence is in Volume 3 of the supplemental excerpt of record. It's a declaration from an expert, pages 458 and 459. Which declaration? I do not remember off the top of my head the individual's name, but it's pages 458 and 459 of Volume 3 of the supplemental excerpts of record. That's what the district court had before it. And I would say, just as an example of the reason — And does he say that the slot machines are live call bingo? He says these machines are not slot machines, and he explains in detail why. But they're not live call bingo.  They're not live call bingo. Okay. And so if the State here is allowed to define bingo, then it wins. But this Court's precedents have said that it's not permissible for the governmental defendant or any ADA defendant to define the problem out of existence. And I think the Martin v. PGA Tour case is the preeminent example of that. Well, I suppose. But that's an assistance case. I think the question — the State's argument is this is a whole different game. This is a whole different game. These devices are actually a different game from the one that's authorized under the statute. And I appreciate your argument that you can define bingo away, but it is a different game. Your Honor, it is an electronic version of bingo. And the district court found, as a matter of fact, that it's still bingo. The cases use terms like fundamental nature or essence of the game. And what this Court and the Supreme Court as well said in Martin is that walking is not fundamentally part of golf. And I — The risks are quite different.  And there's — and according to one of the affidavits about the fellow who tipped his chair and then came back eight minutes later, there's no — there's really no risk of not collecting your winnings. That is, you can't sleep on your card, which is one of the risks inherent in bingo, as we all learned as kids. That's one of the — But those are two big risks that are a part and parcel of live call bingo that are not there when you have a machine that automatically calculates your winnings. The only thing you could lose on would be to walk away from the machine as it's paying you. And those are two of the risks that disabled individuals disproportionately suffer from due to various physical and cognitive disabilities. And those are two of the burdens that these machines accommodate for these individuals. Let's turn then to the accommodation question of reasonable accommodations. Why isn't either live assistance or a card-minding machine adequate for the disabled? Very quickly, Your Honor. The card-minding devices do not address the physical and cognitive disabilities of these individuals. And that is explained at length in these declarations. Those pages of the briefs I cited to you are chock full of very specific references to the record. And they do not address the physical and cognitive disabilities of those named individuals. And the live assistance is not meaningful accommodation because it basically says to the disabled individual, you don't need to play. Someone else can play for you. And that's like saying to Mr. Martin, you can let someone else play golf for you and you can have the benefit of his score. And he can walk the course. Now, Martin, I thought the analogy that somebody I read in here, the Martin case is more analogous here. If you had a person playing video golf inside the clubhouse competing here, Martin was hitting the ball. He was making all the calls and shots. He just wasn't working, wasn't walking. And they said that wasn't an integral part of the game. But here, the integral part of the game, maybe bingo's changed since I went with my mother to the Bilbo Palace, but there were cards and it was a call out and you had to do certain things on the card. That seems to me to be the integral part, like giving shots to Mr. Martin. Two responses, Your Honor. One is that I don't think we can really say in this era that playing a game electronically is not really playing a game. When we play, I don't know if Your Honor does, but if you play hearts on the Internet, we don't say that's not hearts because we don't have the 52 physical cards in front of us. The other reason why it's essentially bingo is... I took a look at these machines and then I tried to liken that to the bingo group. And I'm having difficulty making that transfer. That is, you're in competition with maybe 40 or 50 people. Here you appear to be in competition with a machine. No, Your Honor. How does that work out? I just don't understand it. No, Your Honor, and that's what distinguishes these machines from slot machines. The individuals who play on these machines are playing against other individuals live. As the game is being played, other individuals are playing against them. So if I walk into one of these and no one else is playing, then I can't play at all? Correct, Your Honor. How many people have to be involved before the machine turns on? I know that it's more than a single individual and perhaps... The live demonstration said two. It's certainly more than one, and so it is a competitive game going on live against other individuals. I'm going to turn it over to Ms. Frohlich. Good morning, Your Honor. Sophie Frohlich for the rest of the plaintiff interveners. May it please the Court. I can easily just take up on that, and I know it must be at least one other person. So you can't have two people, Your Honors. Same with live bingo, too, right? Yes, absolutely. Live call bingo, you can have two people. Absolutely. It would be exactly the same. I think the key piece of evidence here for Your Honors to take a look at is the declaration of Nick Farley. He is the expert in this case, and his evidence was before the Court at prior hearings back in 2008. I believe Mr. Grant cited the pages of the record 458 and 459 of the supplemental record volume 3. That key evidence, together with the district court actually going out there and looking at these machines and determining that these machines actually played a form of bingo. And I would just say to Your Honors, we covered up those particular bells, whistles, et cetera, visual aids when the Court was actually looking at them. If you take those away, those machines still play bingo. We're happy to make an accommodation to the software. We've done it already. But this is bingo as bingo is understood by the district court and made that finding. Let me return for just a minute to the comparison between the live call bingo with two people and a machine on which there are two people on two different machines now linked. In the live call bingo, the total pot that would be available in that game would be what if you had two people playing? I'm not sure whatever the bet would be. But isn't it 50 percent of the pot is what is the maximum up to $200 provided by the statute? That's my understanding, Your Honor. But you could, if each bought a dollar card, then you could win a dollar at bingo if there were two people. That's correct, Your Honor. If you're on the two machines, what's the maximum that you can get in credits? Your Honor, I'm not sure. Didn't the record say it was 950 credits? Well, I think you can go and buy up to as many credits as you want. So you could buy more than that. So even if you only had one other person on link online with you at a time, you're not limited in the same way that you would in live call bingo. Sure, Your Honor. There are differences between the games. I mean, the district court found this is a different kind of game, yet at its essence still bingo. Could I ask you a question? I've sort of gotten lost in all of this. We're back to winter. That's what we're going to back. But it seems to me the argument here has been likely to succeed on the merits. In winter, they didn't even do that because the person wanting the temporary injunction has got four responsibilities, and they have to get all four. So there isn't a 50-50 or two-thirds. You have to win all four. And we've been discussing just one through this entire time. And it strikes me that although I understand your argument, and it is a very basic one, that I think that you would have more difficulty with the likelihood of satisfying the suffering irreparable harm, the balance of equities, and especially the public interest. I want to turn to the latter one. We've been clear that a statute by the government shows the public interest. The district court didn't believe that because he didn't like the way the statute came up or something like that. But I don't see any law that gives him that broad a responsibility to set aside public interest. Thank you for asking the question, Your Honor. It is actually one of the points I'd like to address. I think in this particular case, what you have is clear evidence in the record that there is no ñ Karen Walsh, for example, the sheriff's licensor, said very clearly to the district court, we don't have any law enforcement problems here with this statute. Law enforcement didn't take a position. It wasn't for the purpose of law enforcement. All you've really got here is the purpose of regulation, and the purpose of regulation in this case, Your Honor, I would submit is to get around the ADA. It's to get around something that the district court ruled was going to be a reasonable accommodation, at least on a preliminary basis. It looked like they were going to lose, and special interests ran into the fore. So I think the circumstances in this particular case are very different than perhaps the normal deference to the legislature that you might ñ But he didn't hold a hearing to make those determinations. He read some newspaper articles and perhaps used his own background and experience. But I don't see a record that he set showing that this wasn't a normal statute that we shouldn't grant public interest to. Well, Your Honor, I guess in that respect, you're correct. There was no hearing. But I think what this Court's precedent suggests is that what you have to do is evaluate each and every statute to determine whether it complies with a federal statute. That's a question of law. And therefore, the deference has to be weighed against whether it actually complies with federal law. And at this point, on this record, it just doesn't. There is absolutely nothing in the record. The county's ordinance, for example, was passed and in effect in January. And the county's ordinance provides for electronic cardminders. They could have come into court and presented evidence that the electronic cardminders were a reasonable accommodation, but there is nothing here. On this record, we just don't have it. So then it becomes really a question of whether this statute complies with the federal ADA. Therefore — Is there one? Well, we have shown a great deal of deference to the local people carrying out especially vice areas. And the Supreme Court has told us to be very careful of that. Isn't this one of those areas? Your Honor, I would submit it is. But, again, I would go back to this record. On this record, we just don't have any evidence at all of compliance with the ADA. We have some theoretical ideas. Are you suggesting that the statute shouldn't be given any public interest benefits because it doesn't comply with some other regulation? Your Honor — What is the case that tells us we should do that? What I'm suggesting is that, yes, they deserve some deference. However, in this case, we need a full trial on the merits to see if the statute actually complied. And at this point in time, we just don't have that. Is one scheduled? That was one question I was going to ask you. What's the schedule for a trial on the case? Do you know? Yes, Your Honor, I do. Trial has been moved because we're in the middle of extensive discovery at this time. Trial right now is August 30th next year. Okay. We are in the middle of — we've done expert report exchanges. We've done boxes of documents. We're in the middle of all that right now. All right. You wanted to finish your question. Sorry. No. No, I'm fine. I appreciate your comments. But I'm not sure now what public interest really means because I assume that we would defer to the legislature. We may not agree with them, but we would defer to the legislature. I don't know what else they would show other than this is a statute. I think, if you don't mind, the question on public interest is not peculiar, but it's more important in the preliminary injunction context than it would be. And I thought your answer was, well, the federal ABA trumps, which may be true as a final matter, but we've got to decide the remedy. So what's your best argument that the district court adequately balanced the public interest in this case? Well, I think the interests at this point also include the interests of the charities who provide services to the disabled. They certainly include the disabled and their interest in playing the game here. And they certainly also include my client Capital Bingo's interests, which are to make money, quite baldly. And you put all those together and you balance them with something that law enforcement didn't endorse, something that law enforcement really has had no problem enforcing up until now. That's, again, the declaration of Karen Walsh. And you balance it with the fact that this was a gut and amend bill that came on the heels of the end of the legislature with 11 days. And I'm not sure that there's any kind of real resolution here, but I am sure that the ADA does trump in this particular situation. Well, the balance of equity, that sounds more like a balance of equities argument. There's no balancing of public interest in the sense that once the public interest is stated by the statute, then that's the public interest. That's what we've held. But you've, the district court didn't choose to do that. It didn't do any balancing. It just said, I'm not going to consider this because I think it was completely corrupt. Your Honor, I think if you read the transcript of the hearing, I think the district court actually did consider that, and it specifically was concerned about this very issue. It asked the county whether Karen Walsh had any particular enforcement issues. It asked the county whether there were any particular harms at issue here. It looked at the kind of harm at issue here. It said, you know, winter was a national security interest. There were other interests here. There's no public. The irreparable harm issue? Yes. I'm sorry. Are you talking about the irreparable harm issue? That's fine. I'm sorry. You can segue into that. I mean, in your client's case, you're talking about economic damage, which is not irreparable, I expect. Certainly in our client's case of capital bingo, that's true. But I would submit, Your Honor, not in the case of Mr. Foss, who plays bingo, and certainly not in the case of the charities. Yeah. I understand that. Our questions have taken you over time. But do you have any concluding thoughts or further questions for the panel? Just one concluding thought, Your Honor. I asked for a case on irreparable harm. That would be California Pharmacists Association case 563F3D at F- I'm sorry, at pages 852 to 53. We would refer you to that one cited in our briefs. And, Your Honor, I think that's it. All right. Thank you very much. We'll hear rebuttal. Briefly, initially, as to the declarations of the individuals that were put in relative to the electronic bingo machines, when they say that they're playing, they're playing these electronic devices. They're getting enjoyment out of them, just like anybody who goes to Thunder Valley or something like that gets enjoyment out of them. The second point that I want to bring up is, as mentioned by counsel, you can cover up the gambling displays that are what make these games so enjoyable to people, and then the little bingo thing goes, which is off to the side. The little bingo thing goes on. That is the part, and so that's wholly unnecessary as a reasonable accommodation, which has to be addressed by this court. These are not a reasonable accommodation as they sit because the main feature of them, the little gambling games that they play, are wholly unnecessary. Then finally, and there's the regulations and Tennessee v. Lane, not Tennessee v. Lane, but the regulations implemented in the ADA say that a reasonable accommodation must be necessary to prevent discrimination. They've just said that you can cover up a main feature of these and the machine operates. So they're not necessary to prevent discrimination. Finally, as to the public interest, I would like to cite Artichoke v. Norton, which states that the court has recognized the regulation of vices such as gambling is a function that lies at the heart of the state's police powers. The state was not attempting to get around an ADA claim. The state was simply trying to keep charitable bingo within the scope of its intent. It wasn't trying to do anything more than that, and that's the intent, and that's consistent with its police power in terms of regulating gambling. The fact that there might be different forms of gambling going on, which the court seemed to view that as being open season on any form of gambling, does not mean that the state doesn't have a valid police power interest in limiting the scope of it in the different contexts, be it tribal, be it charitable, be it card rooms, and that's one of the points that we brought up in our brief. Let me ask you one question. We're here on a preliminary injunction, not on the final case. Apart from the harm that we would always consider to the state and the interest that the state has in enforcing its laws, what's the real damage to the state from waiting until trial on this to enforce the statute? Basically, at this point, we're over a year from the initial preliminary injunction. And so now you have basically all of the charities, not just in Sacramento County, but throughout the state, feel that they can use electronic gambling devices that would be violative of Penal Code Section 330B without any restriction. Right. But what's the real harm to the state by saying, okay, look, this is our position. We're going to assert it vigorously, but we're going to have a trial on this in next August, and we'll have a final decision based on the record. The harm to the state is that originally, and I realize that there was a statement that there was no law enforcement interest, but this case was started by the bingo parlors being told to quit using these games by police. So basically, it's the same interest that the state has in restricting any gambling, and that is that different stakeholders, be it the tribes, be it the charities, have certain limitations. If they're allowed to go over these limitations, the whole system, it's just, for instance, what's the harm if the state lottery were allowed to do games beyond what's allowed by statute? The harm is that the system that has been set out, the statutory system of regulation that has been set out by the state, is very specific in terms of different stakeholders. If you have one stakeholder who's bringing in, for monetary purposes, and that's what these machines are for, $50 million, for instance, in Sacramento County, because they're using certain prohibited devices, that creates a very difficult problem in the enforcement of the overall scheme of gambling regulation. It is not intended that charities can run casino-like gambling, and that's really the damage. Any further questions? I want to thank all counsel again. We did want to have this hearing. We kind of had to shoehorn it into a bunch of other hearings, but we understand that it's an important case and that we need to timely resolve it, so we wanted to hear it as soon as we could. Thank you very much. That will be in recess for the afternoon.
judges: Wallace, Thomas, Bybee